UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CIV 3206

------------------------------------x

ARTI N. SHAH,

                Plaintiff,

- against -

ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI
a/k/a THE MOUNT SINAI SCHOOL OF MEDICINE;
THE MOUNT SINAI HOSPITAL; THE MOUNT
SINAI MEDICAL CENTER, INC.; MOUNT SINAI
SERVICES; and NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION,

                Defendants.



ECF CASE

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

------------------------------------x

        Plaintiff Arti N. Shah ("plaintiff" or "Dr. Shah"), by and through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants Icahn School of Medicine at Mount Sinai a/k/a The Mount Sinai School of Medicine; The Mount Sinai Hospital; The Mount Sinai Medical Center, Inc.; Mount Sinai Services; and New York City Health and Hospitals Corporation (collectively "defendants"), as follows:

## NATURE OF THE ACTION

        1.     Plaintiff is an interventional electrophysiologist, with board certifications in internal medicine and cardiology. She has practiced in the subspecialty of electrophysiology ("EP") for more than eight years; in that capacity she performs complex procedures often involving catheter ablations and the implantation of cardiac rhythm devices in cardiac patients. In November 2006, Dr. Shah began working for defendants at Elmhurst Hospital Center ("EHC") and Queens Hospital Center ("QHC"), which are part of the New York City Health and Hospitals Corporation ("HHC"). Since 1998, Dr. Shah has also served in the U.S. Air Force

492735 v15                  1

Reserve Medical Corps ("USAFR") and after 2007 in the New Jersey Air National Guard ("NJANG"). Prior to December 2011, Dr. Shah's leaves for military duty were limited to one or two of the days she would have been scheduled to work for defendants.

2.   In December 2011, plaintiff for the first time had a three month military leave (the "2011-2012 Leave"). When Dr. Shah returned from leave in February 2012, defendants began to discriminate against her on the basis of her military service. Defendants restricted her laboratory privileges, gave her first negative evaluation, and prevented her from participating in complex procedures at Icahn School of Medicine at Mount Sinai a/k/a The Mount Sinai School of Medicine ("MSSM") as she had regularly done prior to the 2011-2012 Leave.

3.   Plaintiff brings this action to remedy defendants' unlawful discrimination on the basis of military status in the terms and conditions of her employment. Defendants' conduct violates the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 et seq. ("USERRA"); and the New York State Human Rights Law, Executive Law § 296 et seq. ("Executive Law"). Plaintiff seeks injunctive and declaratory relief, lost wages and benefits, compensatory damages, liquidated damages, and other appropriate legal and equitable relief pursuant to USERRA and the Executive Law.

## JURISDICTION AND VENUE

4.   Jurisdiction of this Court is proper under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over plaintiff's Executive Law claim pursuant to 28 U.S.C. § 1367 because this claim closely relates to the USERRA claim, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants reside in the Southern District of New York.

## PARTIES

6. Plaintiff is a resident of New York.

7. Defendant Mount Sinai Hospital ("MSH") is a teaching hospital associated with MSSM and is part of The Mount Sinai Medical Center, Inc. (the "MS Medical Center"). MSH provides primary, secondary, and tertiary medical care and has its principal place of business at One Gustave L. Levy Place, New York, New York.

8. Defendant MS Medical Center is a teaching facility encompassing MSH and MSSM with its principal place of business at One Gustave L. Levy Place, New York, New York.

9. Defendant MSSM is a medical school associated with MSH and part of the MS Medical Center. MSSM has over 600 students and over 1,300 faculty members. MSSM has its principal place of business at One Gustave L. Levy Place, New York, New York.

10. Defendant Mount Sinai Services ("MS Services") is an organization associated with MSSM with its principal place of business at One Gustave L. Levy Place, New York, New York. Upon information and belief, MS Services is responsible for the hiring and management of employees at MSSM and EHC.

11. Defendant HHC is a $6.7 billion integrated healthcare delivery system. HHC provides medical, mental health, and substance abuse services through 11 acute care hospitals, including EHC and QHC; four nursing facilities; six diagnostic and treatment centers; and over 70 community based clinics. HHC also has relationships with seven medical schools in New York City including MSSM. Upon information and belief, HHC employs certain directors

and administrators at EHC and QHC and exercises joint control with MSSM over certain operations at EHC and QHC.

12. Defendants are associated with EHC, which has its principal place of business at 79-01 Broadway, Elmhurst, New York. EHC is one of 11 acute care hospitals associated with HHC. The hospital provides primary, secondary, and tertiary medical care. MS Services provides all professional staff for EHC. MS Services also oversees clinical and laboratory services, training programs, and research activities at EHC.

13. Defendants are associated with QHC, which has its principal place of business at 82-68 164th Street, Jamaica, New York, QHC is one of 11 acute care hospitals associated with HHC. The hospital provides primary, secondary, and tertiary medical care.

## FACTUAL ALLEGATIONS

### Background

14. Dr. Shah has extensive experience in EP, cardiology, and internal medicine. In 1997, Dr. Shah received her Doctor of Medicine and Master of Science degrees from American University of the Caribbean School of Medicine. In 2001, Dr. Shah completed an internal medicine residency and cardiology fellowship at Drexel University College of Medicine in Philadelphia. In 2006, Dr. Shah completed an electrophysiology fellowship at St. Luke's – Roosevelt Hospital Center in New York City.

15. Dr. Shah has been certified by the American Board of Internal Medicine in the fields of Internal Medicine and Cardiology. Dr. Shah has also been certified by the Education Commission for Foreign Medical Graduates. In addition, Dr. Shah is licensed to practice medicine in New York, New Jersey, Pennsylvania, and California.

16. In November 2006, Dr. Shah accepted a position as Director of EP Services at EHC and QHC and as an assistant professor at MSSM.

17. As a Director of EP, Dr. Shah regularly sees patients and performs various procedures including permanent pacemaker ("PPM") and cardiac defibrillator ("ICD") implantations, EP studies, and catheter ablations. As an assistant professor, Dr. Shah teaches medical students, residents, and fellows about EP and also provides clinical training.

18. Beginning in 1998, Dr. Shah has served in the USAFR. Between 1998 and 2007, Dr. Shah served as an Officer in Charge on the Critical Care Air Transport Team and as Chief of Professional Services. In 2007, USAFR appointed Dr. Shah as the Chief of Clinical Services for the 177th Fighter Wing of NJANG.

### Dr. Shah Excels at EHC, QHC, and MSSM

19. Dr. Shah has excelled at her work as Director of EP for QHC and EHC and as an assistant professor at MSSM.

20. On March 25, 2008, Dr. David Rubinstein ("Dr. Rubinstein"), Director of Services at EHC, issued to Dr. Shah a written peer review stating Dr. Shah "has a comprehensive knowledge base in general cardiology and in EP in particular"; "exceeds technical standards in EP"; demonstrates sound clinical judgment in her assessment of EP cases"; "demonstrates a high level of professionalism"; and "is an excellent teacher."

21. On April 19, 2010, Dr. Deborah Reynolds ("Dr. Reynolds"), Cardiology Director of Inpatient Services at EHC, issued to Dr. Shah a written peer review stating Dr. Shah has a "very good success rate for PPM and ICD implantation," has "excellent" clinical judgment, "works well with attending [physicians]," keeps other doctors well-informed about mutual patients, and demonstrates "excellent" professionalism.

### Defendants Discriminate Against Dr. Shah on the Basis of Her Military Status

22.     Prior to December 2, 2011, defendants did not require Dr. Shah to apply her accrued vacation time toward her military leaves.

23.     On December 2, 2011, defendants began requiring Dr. Shah to apply her accrued vacation time toward military leaves of any length.  Generally, prior to that time, Dr. Shah's military leave was no more than one or two days that she would have been scheduled to work for defendants.

24.     On December 3, 2011, Dr. Shah left for the 2011-2012 Leave, her first extended military leave.

25.     When Dr. Shah returned from the 2011-2012 Leave on February 28, 2012, defendants' discriminatory treatment on the basis of her military status became apparent.

### Defendants Restrict Dr. Shah's Privileges

26.     On February 28, 2012, Dr. Shah met with Dr. Rubinstein who appeared displeased that Dr. Shah had been away for three months on military leave.  Dr. Rubinstein reprimanded Dr. Shah for not communicating about her patients and for not arranging adequate coverage for EP patients prior to the 2011-2012 Leave.  These criticisms were inaccurate.  Dr. Shah had communicated to everyone at EHC and QHC about her patients and had arranged for MSSM's EP Service to cover her patients.

27.     Dr. Shah continued to serve as Director of EP at QHC and EHC, but Dr. Rubinstein restricted Dr. Shah's rights and privileges.  Prior to the 2011-2012 Leave, for example, Dr. Shah oversaw the EP Clinic.  After Dr. Shah returned from that leave, Dr. Rubinstein instructed Dr. Shah to follow the direction of Dr. Thomas Marino ("Dr. Marino"),

Director of Ambulatory Care at EHC. Dr. Marino required Dr. Shah to obtain his permission before making certain changes such as cancelling a clinic date when taking leave.

28. Similarly, prior to the 2011-2012 Leave, Dr. Shah oversaw one of the two Catheterization Laboratories ("Cath Lab") at EHC twice a week and was able to schedule time in a Cath Lab on other days of the week as needed for her patients. After Dr. Shah returned from that leave, Dr. Rubinstein required Dr. Shah to answer to Dr. Mazullah Kamran ("Dr. Kamran"), Director of Cath Labs at EHC, who greatly restricted Dr. Shah's ability to schedule time for patient procedures in the Cath Lab.

29. Dr. Rubinstein also required Dr. Shah to have weekly meetings with Dr. Kamran to review Dr. Shah's EP cases. Dr. Shah's cases had never before been subject to mandatory review in this way. In addition, Dr. Kamran, an interventional cardiologist, lacked the qualifications to review Dr. Shah's EP cases.

30. Prior to the 2011-2012 Leave, Dr. Shah regularly participated in complex procedures at MSSM. MSSM has facilities and equipment, not available at EHC and QHC, that allowed Dr. Shah to perform safely essential procedures for EHC and QHC patients. After Dr. Shah returned from that leave, however, Dr. Rubinstein repeatedly instructed Dr. Shah not to send cases to MSSM.

31. On March 8, 2012, for example, during a meeting with Dr. Rubinstein, Dr. Shah mentioned that she had a patient scheduled the next day for a PPM extraction at MSSM. When Dr. Rubinstein heard this, he told Dr. Shah, "I don't want you to go there. There are too many things to do here [at EHC] and we need to get control of your service." Dr. Rubinstein also stated, "You have been [to MSSM] too many times and I do not know where you are many times. There are too many cases taken to [MSSM] and we need to review them." Dr.

Rubinstein's statements were inaccurate as Dr. Shah always advised administrative staff of her schedule for performing procedures at MSSM and always told everyone that she could be reached by cell phone or pager while at MSSM. As a result of Dr. Rubinstein's opposition, Dr. Shah was not able to participate in the PPM extraction on her patient at MSSM and since then has not been able to participate in complex cases at MSSM for the patients that she treats.

### Defendants Issue Dr. Shah Negative Evaluations

32. Prior to 2012, Dr. Rubinstein had never performed a formal evaluation or assessment of Dr. Shah's work. Neither had Dr. Rubinstein ever suggested to Dr. Shah that he had issues, beyond everyday disagreements about procedures, with her performance. The only written feedback Dr. Shah had ever received was the peer evaluations which had always been positive. See ¶¶ 20–21, infra.

33. On April 17, 2012, Dr. Rubinstein issued to Dr. Shah an Annual Faculty Appointment Evaluation, which rated Dr. Shah's patient care, teaching, and professionalism as "marginally meets expectations" and listed a number of inaccurate criticisms.

34. On April 30, 2012, Dr. Rubinstein issued to Dr. Shah a Director of Service Reappointment Recommendation Form stating that Dr. Shah "Needs Improvement" on Patient Care, Interpersonal and Communication Skills, and Teaching Ability.

35. These evaluations did not accurately reflect Dr. Shah's performance.

### Defendants Continue to Discriminate Against Dr. Shah

36. On April 30, 2012, Dr. Shah met with Dr. Jasmin Moshirpur ("Dr. Moshirpur"), an employee of HHC and Clinical Dean and Regional Medical Director for the Queens Health Network, and Mr. Wayne Webb ("Mr. Webb"), Chief of Human Resources at EHC. Dr. Shah asked why she was being prevented from doing certain cases that she used to do.

Mr. Webb and Dr. Moshirpur responded that they were reviewing cases and that they would get back to Dr. Shah in two weeks. Dr. Moshirpur said that they avoided performing certain procedures, referring to complex EP procedures, at EHC due to high complication rates and that they preferred to refer those cases to other hospitals. Dr. Moshirpur and Mr. Webb never got back to Dr. Shah. Dr. Shah continued to be limited in the types of cases that she was allowed to do.

37. In or around June 2012, Dr. Shah called Ann Marie Sullivan ("Ms. Sullivan"), an employee of HHC and Senior Vice-President of the Queens Healthcare Network, to request a meeting regarding the ongoing discrimination. Ms. Sullivan did not respond.

38. In August 2012, the main Cath Lab (one of only two Cath Labs at EHC) broke down. Subsequently, Dr. Kamran gave Dr. Shah's cases a low priority, frequently rescheduling them. Dr. Shah was also instructed not to use the lab for procedures that took more than an hour. In addition, Dr. Rubinstein told Dr. Shah to postpone her cases or transfer them elsewhere because other doctors needed to have the functioning lab available for emergency cases.

39. On August 27, 2012, Dr. Shah had three outpatients and one inpatient scheduled for procedures in the Cath Lab. However, because other doctors were given priority to use the Cath Lab, Dr. Shah had to reschedule two of her outpatients. Furthermore, Dr. Shah was allowed to perform procedures on inpatients in the Cath Lab only after 4 p.m. when most of the attending physicians had already left for the day.

40. On or around December 14, 2012, the main Cath Lab broke down again and became unsuitable for patient care. Defendants continued to discriminate against Shah by

reserving the only other Cath Lab for procedures other than those performed by Dr. Shah, making it increasingly difficult for Dr. Shah to perform her job functions.

41. In December 2012, Dr. Shah made arrangements to transfer a patient from MSSM to St. Luke's – Roosevelt Hospital for a PPM implantation. MSSM did not have space for the procedure. When Dr. Rubinstein found out about the transfer, he told the Coronary Care Unit Fellow in charge of the transfer to delay the transfer. Dr. Rubinstein did not inform Dr. Shah about his decision to delay the transfer.

42. On or around January 19, 2013, Dr. Rubinstein asked Dr. Shah to perform an ICD implantation on a patient in the critical care unit. Dr. Shah planned to perform the implantation with a portable fluoroscopy machine. However, the portable fluoroscopy machine produced a suboptimal image, which made it unsafe to continue with the implantation. Shortly after, Dr. Shah was notified that the second Cath Lab was available. Dr. Shah asked and received authorization from Dr. Rubinstein and Mr. Georges Leconte ("Mr. Leconte"), an employee of HHC and Associate Executive Director at EHC, to use the second Cath Lab for the ICD implantation. Dr. Shah completed the procedure within one hour without any complications. The following Monday, however, Dr. Kamran found out about Dr. Shah's use of the second Cath Lab and became upset. Dr. Kamran instructed the hospital administrative staff not to schedule any EP cases in the second Cath Lab.

43. On information and belief, in or around December 2012, Dr. Rubinstein and Dr. Marino began recruiting an electrophysiologist from MSSM, who is not a member of the military, without involving Dr. Shah or the MSSM Section Chief. In or around February 2013, Dr. Marino began referring EP patients to that electrophysiologist rather than to Dr. Shah. At

least one of the patients Dr. Marino referred had already been treated by Dr. Shah. Dr. Marino did not inform Dr. Shah about these referrals.

44. By providing Dr. Shah very little lab time to perform EP procedures, defendants have forced Dr. Shah to refer her patients to other hospitals for their EP procedures. Because they are aware of the restrictions defendants have imposed, doctors outside of EHC and QHC have begun referring patients elsewhere for EP procedures.

45. Upon information and belief, Chris Constantino ("Mr. Constantino"), an HHC employee and the Executive Director at EHC, and Mr. Leconte are both aware of the ongoing discrimination against Dr. Shah. Neither Mr. Constantino nor Mr. Leconte has addressed the discrimination.

46. Dr. Shah continues to face discriminatory restrictions on her privileges.

## FIRST CAUSE OF ACTION

### Military Status Discrimination Under USERRA

47. Plaintiff repeats and realleges paragraphs 1 through 46 as if fully set forth herein.

48. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her military status in violation of USERRA.

49. Defendants' unlawful discrimination against plaintiff was willful.

50. As a consequence of defendants' violation of USERRA, plaintiff is entitled to damages pursuant to 38 U.S.C. § 4323(d) including equitable and injunctive relief, lost wages and benefits, and liquidated damages.

## SECOND CAUSE OF ACTION

### Military Status Discrimination Under the Executive Law

51. Plaintiff repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

52. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her military status in violation of the Executive Law.

53. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) Declaring that defendants' conduct complained of herein violates plaintiff's rights under USERRA, and the Executive Law;

(b) Enjoining and permanently restraining defendants from violating USERRA, and the Executive Law;

(c) Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) Directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and otherwise unlawful conduct;

(e) Directing defendants to pay plaintiff compensatory damages for her mental anguish and humiliation;

(f)     Directing defendants to pay liquidated damages under USERRA because of defendants' willful discrimination against plaintiff in violation of USERRA.

(g)     Directing defendants to pay plaintiff's attorneys' fees, costs and disbursements;

(h)     Directing defendants to compensate plaintiff for any adverse tax consequences;

(i)     Directing defendants to pay prejudgment interest; and

(j)     Granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       May 13, 2013

                                        VLADECK, WALDMAN, ELIAS
                                        & ENGELHARD, P.C.

By: _____
                                        Debra L. Raskin
                                        Attorneys for Plaintiff
                                        1501 Broadway, Suite 800
                                        New York, New York 10036
                                        (212) 403-7300